Case number 24-1975 Elizabeth Kerwin v. Trinity Health Grand Haven Hospital Oral argument not to exceed 15 minutes per side. Mr. Fanning for the appellate. It pleased the court Richard W Fanning jr. of Clark Hill representing appellant respondent Trinity Health Grand Haven Hospital. I will be reserving three minutes for rebuttal today. In its decision the district court abused its discretion in several ways which are highlighted in our briefs. In the argument today I want to focus on the following reasons as to why the opinion and order of the court should be reversed and the injunction which has been imposed on my client should be lifted immediately. First off the district court abused its discretion by misapplying the Supreme Court's decision in Starbucks v. McKinney. That case made it clear that a petitioner seeking an injunction under section 10 J of the National Labor Relations Act must make a clear showing on each of the four elements of traditional that are traditionally required for preliminary injunctions. As will be clear in my case on our circuit on post McKinney is there any case law in our circuit? None that I none that I found your honor. So I have we're started writing today for for the I believe that to be the case sir yes. Would we revert back to our normal preliminary injunction case law in our circuit for binding precedent? Judge I would argue that the standard set forth in Starbucks and McKinney creates a standard of a clear showing on each one of those. So there has to be clear evidence on the record to have a 10 J injunction. That would be the general standard in any other area wouldn't it? Your honor I would believe so but you see the district court created and especially when you get to irreparable harm it inferred irreparable harm. It found that there was a reputable harm because this was a refusal to bargain case. It did not and it drew that inference and it's our position that in that element particularly that drawing that inference But we don't normally infer irreparable harm in our circuit do we? I would think not sir. Yeah so we can just go back to what our existing preliminary injunction standard is for every every other case. I would say under Starbucks versus McKinney as long as there's the requirement that petitioner make a clear showing based on the record evidence and if that accords with and I'm sorry I did not read all of the non-NLRB injunction cases in the circuit so I'm a little bit uncertain how to answer but if that precedent aligns with Starbucks versus McKinney's statement of there being a clear showing then I would concur. So in addition to that you will see that there are two clear or at least I would say three. Just to clarify on that there's a difference between inferring from facts before you and material in the record and making an inference ab initio so that it is permissible for is it not for a district court to make inferences from the facts before it or that it finds. I would say under Starbucks versus McKinney there has to be facts on the record to that to allow the district court to make that that judgment. So in this case for example all of the back and forth about how many people came to the union meetings and whether they were being discouraged by the disaffection petition and so forth and the management's actions those are facts on the record from which they could draw an inference and then we would just have to decide whether it's a permissible inference not whether it's a an irrebuttable presumption which is kind of the way you're talking about it isn't it as though it were in an irrebuttable presumption by the district court. Well because when you look at that actual attendance data and this is something that I think the court frankly made a factual error on it found that the attendance data fell by half after recognition was withdrawn on September 28th. When you look at and this was evidence that the petitioner brought and I think the district court thought that we were bringing this evidence up this was something that the petitioner brought as its evidence to show that there had been a loss of employee support for the union. When you look at this and I do want to note an embarrassing error in our main brief where we put a couple of dates on that should be October 3rd and October 25th as being September I would refer you to page 18 of our reply brief where we correct that and what you see is you see before we withdrew recognition on September 28th of 23 the two meetings before that were at on September 11th 23 and September 21st 23 and this is page ID 162 in the record. You see 16 people and nine people that's pre withdrawal of recognition. After withdrawal of recognition the next meeting is October 23rd sorry October 3rd of 23. 23 people attend. That's not a falling by half that's a doubling. Then you see the next meeting October 25th. 11 people. That's even more than they had immediately prior to withdrawal of recognition. Then they don't apparently have any union meetings which of course is their choice my client has nothing to do with that until March 4th of 23. They have eight people there more or less exactly where they were before withdrawal of recognition. Understand the 180 total employees roughly that were in the unit. Depending upon the day you're talking about people come people go but we can use somewhere 180 is a fair number we can probably use that for the sake of our I'm not trying to trick you yeah yeah I understand judge. So these number I mean the biggest the largest meeting through this whole three four month period was 30. Correct. Just one sixth so it's not like everyone is showing up that and that like there was even majority showing up ever for these meetings there's always a smallish number. I concur I mean these aren't my numbers it's not my exhibit but I'm what I'm trying to but I concur they did not have overwhelming support based on the metric that petitioner uses and it's just not correct that they fell that the numbers fell after we withdrew recognition. If if one's using that as a metric for employee support of the union to show irreparable harm which is what the petitioner did in the district court inferred its conclusion from those facts aren't there. Suppose I thought those numbers were kind of muddled and they don't really tell a story one way or the other what about any other evidence of reputable harm weren't there wasn't there an employee or two who filed a statement saying they were dissatisfied with things or there's some employees kind of shopping around for other jobs. There was an affidavit that was filed by Mr. Ricky Kaufman who at the time I believe was the union president. That affidavit when you look at it rests on hearsay statements from three three employees who came to him three out of up the hundred and eighty number we're going to use. One of them he doesn't even know the person's last name and from their statements he's inferring that this must be one person says I don't want to be on the union board anymore he and he says I believe that was because one person says she's frustrated about something he says I believe this is because. The the affidavits don't have any and that was from I'm blinking on the date but it was before even the petition was filed. Petitioner could have gotten an update updated affidavit from Mr. Kaufman they did not. Is there collective bargaining agreement currently in effect? No sir there is not. When did it end the last one? Well I believe the last collective bargaining agreement was extended through February of 23 I know that's in the record judge I'm trying to that's not a number I looked at. That accords with what I was thinking. So currently how are employment relations handled by the by your client? Well currently we're operating under a 10-J injunction which requires us to recognize and bargain with the union. Right so you are bargaining for CBA at this point? I am not personally involved with negotiations but it's my understanding that the client is is continuing to bargain and we're certainly complying with the injunction and there's been no claim or not. Okay I was interested in the the particular things that Mr. Kaufman listed in his affidavit in paragraph 10 on page 4. The bullet points that would seem to me to be about but the most specific thing that he was alleging that might be affected if they didn't get the injunction in the interim. Do you recall those points? Yeah were those the impact of employees where he was saying that conditions of employment have been changed? He says moving our health care benefits to a different system, changing our holiday premium pay for cutting by cutting benefits. There's a whole list of things. Yeah I believe judge that for example they moved them on to the non-union health care immediately after they withdrew recognition. I believe that they had a lower employee premium contribution. There were wage increases that were given out. There were things in that affidavit that Mr. Kaufman neglected to mention. I believe they're in the administrative record and were briefed in front of the ALJ. They weren't really a an issue that's been brought up in appeal but those are things that the employees we believe certainly salary-wise are doing much better. And what is the one is the harm to the to the hospital that's mentioned about not being able to give salary increases because of if there's a union what flesh that out a bit more what what that point is. Certainly the hospital when it withdrew recognition began a quarter this is in the declaration of Mr. Foss began quarterly market reviews because they were having problems with recruitment and retention of employees. So they were giving adjustments. Now if you give adjustments you'd have to go through and bargain with the union. You'd have to go and wages are an issue with the union that still it's not resolved. So rather than being able to say if an employee comes up and says listen I have a job elsewhere I'm gonna leave and say okay well what's it gonna take to keep you your important team member. I need X. Well now you'd have to go to the union and you might say well that's a low seniority employee. These are at the table and it is that any different than any situation that isn't unionized. No sir it is unionized. The same kind of argument would be made from the management side that yes if we don't have the leeway of a non-union situation there's some things we can't do. I thought your primary harm to your side was saying that this will affect patient care because of the uncertainty and the commotion and the turmoil. That was certainly part of a judge when you read through Mr. Foss's affidavit which the district court dismissively referred to as a parade of horribles I think was his phrase and kind of made a credibility determination on a declaration. There's a number of things listed. Is that not something that would be in a sense normal in a situation of this sort where you've had a obviously a highly contested situation? Is there something in that affidavit or information as to why this would be much worse to the management or to the patients than in any other situation? Because I think you're going from a situation where the hospital lawfully withdrew recognition of the union. Then the employees were non-represented. Then now there's this condition kind of nebulous period where there's an injunction only until the board rules and our exceptions have been with the board for a while. The board doesn't have a quorum currently. I have no idea when those exceptions are going to get addressed. Depending upon what the board does the employees may not be The board still doesn't have a quorum. Is that dependent on the slaughter case? If it came out differently would it have a quorum then? It very well might. It's currently depending on that as well as appointments that are pending in the U.S. Senate that are still... You're not responsible for that. Thank you for that judge. Okay, thank you. So your client accepted this decertification statement petition. Disaffection. And you know there are a lot of questions about the signatures and the information was included there. Maybe a third or so, 40-50% of the signatures had more indicia of reliability but a number of them did not. Any thoughts, any additional thoughts on how we should consider that evidence? Yeah, a couple, your honor. First off, the specific issues are briefed. I would just say this. These folks aren't attorneys. There's nowhere you can go that they don't even make public this is what you need. Petitioner accepted. The facts are these. There's not two separate petitions. The employees gathered signatures for the decertification petition. Then they simply kept going. They didn't start over again. So the signatures that were submitted as a decertification petition we obtained in discovery and are part of the record. When you look at those, they line up pretty well with what petitioner accepted for the decertification election. Now I understand there's different procedures and different thresholds, but on the question of whether a signature counts, there should be no difference in standards. Either that signature is acceptable or not. And when you compare those two from... At least I wasn't looking at it whether the signatures were forged, but what the signatures were asking for, that is, I can imagine I would like to have an election, but I'm not going to say which side I'm on depending on how the election comes out. So when I sign a petition that says let's have an election, that's not the same as I'm going to go to the wall for the non-union side. When you look at what was accepted of the decertification petition, the languages don't say I won an election. They say I no longer want the SEIU to represent me. That's true for both the decertification petition and the disaffection petition because they're the same thing. And when the employees kept on going, what they presented to us as a disaffection petition actually has more signatures with that language at the top than what the petitioner approved for the decertification. And again, the thing is, and under Levitz, you only have to reach these standards that the board is now arguing for. They're not in Levitz. Levitz simply says that the signatures have to present evidence that it's more probable than not. I'm don't want to be represented. The testimony on the record is that even from the witnesses that the General Counsel called, was that the person gathering these signatures explained what it was for. So even though that they don't have that language on the top, there's evidence in the record that shows that the employees were explained what it was for. Okay, Mr. Fanning, thank you. Thank you. You may proceed. Good afternoon. May it please the court, Elise Oviedo with the National Labor Relations Board, on behalf of Appalee Regional Director Elizabeth Kerwin of Region 7 of the NLRB. I think the district court said it best when it opined that Trinity, having agreed to hold an election and having agreed that it was fair, must live with the results. Trinity can't meet its burden of showing that the district court abused its discretion because the record and evidence show that the district court properly identified and applied the correct legal precedent and relied on sound findings. Well, we don't have Sixth Circuit precedent. Well, what would the correct precedent be in your mind? We do have some precedent. In Ahern, inferences were found, but as far as the significance of Starbucks v. McKinney, what we have, of course, but what we have there is the whole thing is just apply winter, apply the traditional four-factor equitable test. We already had courts applying that standard and there are several cases. Are you talking about, yes, there's the general standard, but in terms of the labor context, there's no Sixth Circuit case. Well, you also have the panel who ruled on the stay motion. I was on that panel. Stays are very different. Fair enough, your Honor. I can only speak for one of the three, but stays are very different. Right. So if you're saying the stay, that's the only, if you're saying that's the only case in the circuit that we have, then I would probably. No, but what we do have is we have the vast majority of circuit courts. Other circuit, when you're saying circuit courts, just we should be precise, you're saying other circuits, right? Yes. Okay. Yes, except we do have Ahern, for example, that said that inferences were permissible. I mean, nothing has changed, right? I mean, these are factors that have been. I feel like a lot, I don't know, I feel like a lot has changed. I mean, our old test in this context, totally different. But we have winter in all of its. Okay, so the winter, yes. Francisco Foods, you know, Paseo, you know, all of these cases that say that inferences are permissible, including here, I think there's at least eight circuit courts that use inferences. But we, even aside from the inferences, we have actual evidence of irreparable harm here. We have one of the bargaining committee members leaving the bargaining committee saying, there's no union, you know, we'll never get the union back, what's the point now? There were a handful, but the point is, those are the most zealous supporters, so being shocked by at least one that we know of, yes. But then you also have, but we also have all of the employees who were saying we're scared or frustrated, they're experiencing feelings of futility, they were concerned that they were now at will, that they didn't have any rights, that, you know, that there was no union. And the union lost its access to the hospital, so at that point, too, you know. What's bothering me here about irreparable harm is that there definitely is, you know, the union, I guess, is suffering or would suffer if it were not recognized. But how are the actual employees being harmed? Is there any evidence in the record that they would like, for instance, lose their job or not get a pay raise or some sort of benefits if there were not this injunction during the proceeding? Yes, your honor, there's a ton of non-monetary benefits as well. So, absent an interim injunction, employees suffer the loss of benefits, the benefits of good-faith collective bargaining that include negotiated improvements of terms and conditions of employment, which include job security, safety and health conditions, the protection of the grievance and arbitration. From the Kaufman affidavit, is that what you're drawing that from? Those are just, those are just the obvious things that they lose. I mean, you're turning irreparable harm into every, every case is irreparable harm because those factors are true in every single case in this context. So it feels like cases have to have unique facts to them, otherwise it's just an inference that the NLRB always gets an injunction, or they always show irreparable harm. Well, we obviously already have evidence, too, of the wage raise that employees, the union had wanted a different wage raise and that obviously didn't go as planned because they withdrew recognition and implemented their own pay system, as well as their insurance, as was previously mentioned. Is there evidence? I mean, because sometimes employers could increase benefits. They could think, you know, I want to make this a very attractive workplace, so there's not a unionization effort, so. Which is coercive in this context where there's been a secret ballot election held by a neutral third party compared to an irrelevant and deficient. I'm just saying, so six months later, I might say we're giving the employees a raise that maybe they wouldn't have done through the union negotiating process or would have been locked out of doing. Statistically, employees who are unionized have higher pay than employees who are not. That's just a general platitude. I'm just talking about this specific case. Is there evidence that they absolutely were harmed, that there's things that the company did to harm them, or there's things that the company might have done to help them during this time, during this turn you'd call a breach, I guess? Yes, there was, for example, holiday pay was changed, how people could request time off, that was changed. A change, you're saying, detrimentally to employees? Correct. I'll look at the record, I guess, on those. And that's not something that could be rectified at the end, assuming the board upholds the ALJ's decision and the court does too? No. That's not something that could be rectified at the end? No, Your Honor, because by that point, there'll be such erosion of employee support and the union needs those employees for negotiations, and so they can't... That's projecting that there will be, you're saying there will be union derision and union support, but because one person quit the committee a year before that, that's how we're supposed to infer that all hope will be lost for the union? We also have, I know that there's been a lot of discussion about the meetings, but I think it's important to look at those meetings in context because, for example, you have all of those meetings that were in August, right? That was just after the decertification petition had been filed. So let me go... So the decertification petition was filed July 31st, right? And then we have Wednesday, August 2nd, Thursday, August 3rd, we have 23, 24 people, and the rest of August we have 30 and 29, okay? So then the elections conducted on September 18th and 19th, and the union withdrew on September 25th, and so then... The reply brief, they say it's the 28th. I'm sorry. The union withdrew its blocking request on the 25th, and then on the 28th is when they withdrew recognition of the union. Okay. I mean, just over September 11th, are you going to discuss that meeting? Oh, that was the last meeting leading into the election at that point. Yeah, it was the smallest, it was only 16 people. Right, but... The most indicative meeting, the one right before the election, had only 16 people. But that's because most of the people who were already interested in the union had already attended one of the prior meetings. Oh, is that... Is there evidence that people don't go to multiple meetings? I mean, I just find these numbers, and then you had 23, so how do you explain October 23rd? So October 3rd, you have 23. 23 is likely because that was the first meeting held in the immediate aftermath of the withdrawal of recognition, and when you look at that coupled with all of the testimony of employees who were confused, employees were scared, employees didn't know what was going on, it's likely that they went there to find out some answers and to find out what was going on. So then the next one you have after that is October 25th, you have 11, and then... Maybe they were happy with the answers they heard. Or perhaps, you know, at that point... I just find this totally muddled. Like, you could infer a lot of things from these numbers. It's also important to remember that at that point, too, that the union lost access to the facility and the bulletin board. So then you next have eight people, right? So you have this erosion. The data shows an overall downward trend following Trinity's withdrawal of recognition. I see one other question. There's 180 total employees. There's never more than 30 who attended a meeting. So this is a pretty small percentage. That was one-sixth that Max ever went. This is also a hospital where shifts are different. But, you know, on top of that, we also have all the testimony regarding, for example, employees telling the union we no longer want you to contact us. They started blocking the union. They wanted nothing to do with the union. Also, they had 90-some signatures from people who presumably wanted to... who were not inclined to have the union, potentially. You also have all of the evidence on the record, the administrative law judge record, saying that employees didn't know what they were signing. I can cite to you specific... Were any of those emails or other evidence of people saying for the union not to contact them, for any of those individuals, were their signatures on the purported list that was given for asking for the disaffection petition? My understanding is those were union supporters who then said to the union, we no longer want you to contact us. So they had not joined the list. That's my understanding, yes. These are new people. Yes, but just to circle back, so you have the testimony of Kelly Walker, Chelsea Bixby, Sarah Sadler, Brittany Burns. Those are page ID numbers 240 to 241, 400, 436, and 508 to 509, where you have all of this testimony showing people didn't know what they were signing. There was either not a header at the top, or they were just being handed a clipboard and just saying, oh it's something to do with the union, sign it, and then that's it. So there was no other cooperating testimony. Let me ask you about the kind of the legal question I think that might be lurking, about whether or not you can have a disaffection petition in proximity with a decertification election. Levitz clearly says no. Levitz specifically says that no statutory policy would be furthered by requiring employers presented with a decertification petition to withdraw recognition unilaterally in order to avoid violating the NLRA where there was an election. So you have a secret ballot election compared to... Just on the legal point, how is the NLRB determining the statutory policy? I mean I read statutes for their words, I don't necessarily read them for their policies, but the NLRB appears to read them for their policies. Well here it's because you have a secret ballot election where there have been numerous safeguards being taken place, right? And so you need at least, you know, 30% just for showing of interest for an election, but to actually change the result you need 51. That's why the standard is higher compared to the disaffection petition, and you need actual objective evidence, which they did not have at the time of withdrawal. They can't use after acquired evidence. Just for the rule you're stating from Levitz, where in the statute does that come from? In other bright world, we don't defer necessarily to policy judgments of agencies. So where in the statute does this policy come from that we can't consider the petition post-election? There's numerous case law that addresses that the board actually cited when they did not... A lot of cases, but I keep looking at them I keep seeing this sort of policy justification. I don't really see it tied back to a statute. Well, the point of the NLRA is industrial peace, industrial harmony, and if you're going to overthrow, you know, an undisputedly fair election in favor of a disaffection petition that was A, irrelevant, and B, deficient beyond measure, you know, it just doesn't make sense. That doesn't... Well, you want a rule that you just can never consider it. Why, I mean, why isn't... as opposed to a rule that you can consider things, but you look at all the evidence and you assess it. It's blanket rule that the NRB has recognized before. Levitz and Johnson's control... Johnson's say that if there's already an election, then an after acquired, you know, petition of no majority is irrelevant because we already have the sort of... Relevant like forever, or is it a specific time frame, or is it that in light of all the circumstances, the disaffection doesn't undo the decertification? Bingo. It's that the... So you're not arguing for a categorical rule as opposed to... because, you know, what we're trying to figure out here, correct me if I'm wrong, is in a stay, is it likely that the NLRB is going to come out favorable to the Union, as opposed to not favorable to the Union? The ultimate merits, you know, will work their way up, but in the stay, isn't it, is it probable or likely as to how the NLRB will come out? Right, and this is why the district court didn't commit any clear errors, because they're relying on the board's decision denying their request for review of the certification. So we have a lawfully certified Union, you know, they're relying on the winning secret ballot election, and the district court also is relying on the winning ALJD, which... I forget which case now, but I believe it was the Sixth Circuit case that says if you have a winning ALJD, then you have likelihood of success on the merits. Why is the inquiry whether how the NLRB will rule or how the court will rule following the NLRB's ruling? That's what the district court is tasked with. They're tasked with essentially predicting how the board will rule and whether or not the circuit will enforce a final board order. Right, so there's a second piece of it. It's not just how the board will rule, it's also what we would do once the board rules. Any other questions? Okay, well thank you, counsel. Thank you, Your Honors. Just a couple of quick points in rebuttal. First off, looking at, you know, some of the counsel's comments about, well, this is why people didn't attend meetings, this is why people left. We don't have affidavits from those folks. I don't remember them testifying to that in front of the ALJ. I did try the ALJ opinion. The record is voluminous. My recollection is that didn't come out. What we have in front of the district court is Mr. Kaufman's affidavit, and when you look at that, he says that there were changes that were made, but he doesn't say they were negative. He doesn't describe what those changes are, and he says one of the things he points out was that a pay raise was granted to all employees, but he doesn't like the way it was divided up, but so this impact on employees, particularly from wages or terms of conditions, just isn't there. There were some changes. Employees got more money. Those are things that Mr. Kaufman's saying. He's just not happy that the union wasn't able to dictate those things. As far as counsel's statements that Levitz absolutely says an employer cannot accept a disaffection petition in proximity to decertification election, I disagree. Levitz does not say that. Levitz says that an employer who receives it has to honor that or file its own RM petition, which in this case, I don't believe the region would have processed because they would have said we just had a de-cert election. We're not going to process another petition. Therefore, this employer had no choice but to honor that and to take a bigger step back. When one looks at the statute the statute is not only meant to have industrial peace and stability. If that were the case, we wouldn't have any de-cert elections. We wouldn't have... Levitz wouldn't exist. Levitz exists because part of the policy of the National Labor Relations Board is to let employees have their free choice. Employees have a right to be represented by a union of their choice or not. That ultimately is what this case is about. We have a majority of the unit saying that listen or we have the signatures on the petition saying we don't want this union. Why doesn't it make sense to have a little bit of a cooling off period? You have a disaffection petition within a week of the election. I don't know if there's an absolute rule, but does it make sense to have some cooling off period? Judge, I would say this. You're either going to honor the employee choice or you're not. Which is the employee choice? The election or the petition? I would say it would be the petition which came forward which shows the majority of the unit no longer wanted it. There are reasons in the record as to why employees were upset about the blocking charge. That was evidence from when Miss... I'm blanking on her name. I believe in gathering the petitions said that people kept coming to her saying they wanted it over. They wanted the tally to be known and then they found out the union filed the blocking charge. They had to wait. That was the straw that broke the camel's back and that's why you get this second petition. That's why she kept going and people kept getting more signatures. That's one of the records. That's one of when you look at the totality of it, the rule that the election, that's why it doesn't make sense. I can, you know, some of the cases that they cite where the employer knows the results of the election, that's not the case we have here. The employer didn't know. The employer gets this petition. They don't know the outcome of the election. Under Levitz, they have to honor it. The only other option is not available to them and I think from a policy perspective that makes sense. Thank you very much. Thank you judges. I